IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2001 Session

## STATE OF TENNESSEE v. DONALD PAUL PRESLEY

**Direct Appeal from the Criminal Court for Anderson County**
**No. 99-CR-0211     James B. Scott, Jr., Judge**

———————————

**No. E2000-00592-CCA-R3-CD**
**August 14, 2001**

———————————

The appellant, Donald Paul Presley, pled guilty in the Anderson County Criminal Court to voluntary manslaughter, a class C felony. Pursuant to a plea agreement, the trial court sentenced the appellant as a Range I standard offender to four years incarceration in the Tennessee Department of Correction. Moreover, following a sentencing hearing, the trial court ordered that the appellant serve his entire sentence in confinement. The appellant now appeals the trial court's denial of any form of alternative sentencing. Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

J. Thomas Marshall, Jr., Clinton, Tennessee, for the appellant, Donald Paul Presley.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; James N. Ramsey, District Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

On July 6, 1999, an Anderson County Grand Jury returned an indictment charging the appellant with one count of second degree murder. The indictment resulted from the shooting death of the appellant's wife, Candace Hope Presley, on May 14, 1999. On November 5, 1999, the appellant pled guilty to the lesser included offense of voluntary manslaughter in return for a sentence of four years incarceration in the Department of Correction. The parties agreed that the trial court would determine whether the appellant was an appropriate candidate for alternative sentencing.

In accordance with the plea agreement, the trial court conducted a sentencing hearing on February 11, 2000. At the hearing, the State preliminarily introduced into evidence a pre-sentence investigation report. The report reflects that the appellant was twenty-seven years old at the time of his offense. He and the nineteen-year-old victim had been married for approximately eighteen months and had infant twin daughters. The appellant possesses no history of criminal convictions or criminal behavior. His educational background comprises his graduation from high school and some attendance at Roane State Community College, where the appellant purportedly received certification as an emergency medical technician. As to his past employment, he served in the United States Navy for four years before receiving an honorable discharge. Otherwise, his employment has been sporadic. Moreover, the appellant has received psychiatric or psychological treatment for depression since the early 1990s. Following his offense and prior to the sentencing hearing in this case, the appellant was admitted to Ridgeview Psychiatric Hospital complaining of hallucinations and threatening suicide. At the time of the sentencing hearing, he had been released from the psychiatric hospital "with a regular treatment plan."

Attached to the pre-sentence investigation report was a victim impact statement completed by Willie Mae Shadrick, Ms. Presley's aunt. In her statement, Shadrick primarily expressed her strong disapproval of the plea agreement between the State and the appellant. In this regard, Shadrick indicated her disbelief of the appellant's account of the homicide, noting that the relationship between the appellant and his wife had been deteriorating prior to this offense, and Ms. Presley had confided to her aunt that, "if [the appellant] ever got violent with her[,] she would have to leave him."

In addition to the pre-sentence investigation report and the victim impact statement, the State presented the testimony of Becky Rod, an investigator employed by the Domestic Violence Unit of the District Attorney General's office. Rod testified concerning the incidence of domestic abuse in Anderson County. Specifically, she related to the trial court that the number of orders of protection issued by the Anderson County General Sessions Court, which court hears cases involving unmarried parties, had increased from 114 in 1998 to 166 in 1999, approximately a forty-five percent increase. Rod further observed that the number of orders of protection issued by the Anderson County Chancery Court, which court hears cases involving married parties, had increased from 148 in 1997 to 345 in 1999, approximately a 133 percent increase. Rod conceded that the Domestic Violence Unit contained no record that Ms. Presley had ever sought an order of protection against her husband.

The appellant in turn presented the testimony of Steve Speelman, the principal investigating officer in his case. According to Speelman, the appellant provided a statement to police soon after his offense. In his statement, the appellant related that, on May 14, 1999, he and his wife were at home with their infant twin daughters. The Presleys had placed their daughters in the twins' bedroom and were in the living room when they began arguing. Specifically, they began arguing because the appellant asked his wife to bring him a pen and she brought him a pencil instead. The argument quickly escalated into a shoving match. Additionally, Ms. Presley, who was five feet and two inches tall and weighed one hundred and eighty-five pounds, began hitting the appellant,

who was six feet and four inches tall and weighed one hundred and seventy-five pounds.[1]  The appellant in turn struck his wife on the face several times, whereupon Ms. Presley hit the appellant in the groin, causing him to fall to his knees.

While the appellant was incapacitated, Ms. Presley ran into the master bedroom and retrieved a nine millimeter pistol.  When the appellant followed his wife into the bedroom, Ms. Presley stated, "[G]et out or I will kill you."  Nevertheless, the appellant approached his wife and attempted to disarm her.  As the appellant grabbed the pistol, the weapon discharged.  A struggle ensued, and the weapon discharged two more times.  The appellant related that, following the third shot, his arm "got warm and burning."  At this point, the appellant forced the barrel of the pistol toward his wife's chest and forced the gun to discharge a fourth time.  The appellant asserted to police that he merely intended to frighten his wife.  However, he acknowledged his awareness that his actions "had the possibility to hurt her but I did not think it would be serious.  I wanted the gun away from her before me or my children got hurt."

The bullet fired by the appellant entered Ms. Presley's body through her chin and exited through the top of her head, apparently killing her instantly.  Immediately thereafter, the appellant ran outside the apartment and knocked on the front doors of several neighboring apartments.  When no one responded, the appellant flagged down a passing automobile and asked the driver to call the police.  He then returned to his apartment, retrieved his two daughters, and awaited the arrival of the police.

Speelman confirmed at the sentencing hearing that, in addition to the bullet that caused Ms. Presley's death, the police recovered two bullets near the doorway of the Presleys' bedroom and one bullet near the foot of the Presleys' bed.  Speelman also confirmed that the appellant had a powder burn on the inside of his left forearm.  Speelman explained:

> Powder burn normally occurs when an individual, when his skin is within very close proximity to the discharge of a firearm.  It is a result of the powder that is in the bullet.  And when the bullet is fired, not only does the projectile come out of the casing and exit the weapon, but also the powder comes out.  The powder is obviously very hot when it touches the skin.  It causes very minute burnings . . . .

Finally, Speelman recalled that, immediately following his offense, the appellant was upset and concerned but did not appear remorseful.  The officer elaborated: "[The appellant] appeared to be upset over the fact that that incident had occurred.  He was very emotionally upset.  However, there was no mention that I can recall concerning, you know, my poor wife or anything along those lines."

The appellant additionally presented the testimony of his grandmother, Jean Presley Bartley.  With respect to the instant offense, Bartley testified that she saw the appellant and his wife

---

[1]The record reflects that the appellant weighed approximately 230 pounds at the time of the sentencing hearing. However, at the guilty plea hearing, in providing the trial court with the factual basis of the appellant's plea, the prosecutor stated that the appellant weighed 175 pounds at the time of this offense.

regularly and frequently prior to Ms. Presley's death. In contrast to the victim impact statement submitted by Ms. Presley's aunt, Bartley asserted that she "never even observed any animosity between [the appellant and his wife] ever, not even the slightest." As to the trial court's sentencing determination, Bartley stated that, were the trial court to grant the appellant probation, she would assist the appellant financially in returning to school and continuing his training in the paramedical profession.

Friends of the appellant also testified on his behalf. First, G.W. Bass testified that he had known the appellant for twenty years. He asserted that the appellant is "an average, calm guy." Indeed, Bass asserted that he had never seen the appellant angry. Second, James Early, a corrections officer with the Knox County Sheriff's Department, testified that he became acquainted with the appellant in 1997 during the appellant's brief employment by the Department as a corrections officer and that he had since maintained contact with the appellant. Like Bass, Early asserted that he had never witnessed the appellant lose his temper, nor did Early ever observe the appellant employ violence against inmates in the county jail. Early noted that the appellant "actually is a very level-headed individual. He handles stress extremely well."

The appellant testified on his own behalf at the sentencing hearing. He related that, since his wife's death, he had been "real depressed" and wished that his wife "would be here." The appellant confirmed that he had received treatment for depression at Ridgeview Psychiatric Hospital, adding that he had also received treatment at Lakeshore Mental Health Institute. The appellant testified that he was currently taking antidepressant medications. With respect to the sentencing issue before the trial court, the appellant asserted that he should receive probation because "[i]t was a terrible thing to happen, but it was an accident." He related that he was frightened at the time of this offense and, in contrast to his statement to the police, asserted that he did not intend to fire the pistol.

At the close of the proof, the State noted the need to deter domestic abuse in Anderson County and, accordingly, asked that the court either deny the appellant any alternative sentence or grant the appellant an alternative sentence of split confinement. The appellant, in turn, sought either a sentence of split confinement or full probation, emphasizing his lack of any history of criminal convictions or criminal behavior, his record of military service, and the "strong" support of his family. The trial court followed the State's suggestion by denying the appellant any form of alternative sentencing. However, the court did not rely upon the need to deter domestic abuse. Instead, the court entered the following observations into the record:

> The question now becomes whether this person is going to be serving the sentence or what type of sentence he serves. Let me say this to you. I have considered this statement that the defendant has given right after the taking of this life. When I say "taking of the life," it was taken in the heat of passion. Now the General here says that a split confinement, but there is something about that that bothers me because it looks like that I am in some way surrendering what I consider to be a very strong case of voluntary manslaughter. Because

of the statement that the defendant said that he turned the gun and didn't really think it would hurt her, but he discharged that weapon. That is what he said in the statement. That was the night that this occurred. Now taking the life, even under voluntary manslaughter, should be something that we take very serious in society. Now I send some people off that go out and sell a little over five-tenths gram of cocaine, young men, usually they are men of color who don't have any income at all. And I send them off to the penitentiary for eight years. And even though the courts may reverse for this, I am sincere I believe that there is sufficient evidence here that I cannot in good [conscience] provide any type of split confinement or probation for th[is] offense[]. . . . [W]e should think life is more precious than to be able to explain away a temper. Even though I have got a temper. In this case what he said was that he really didn't think it would hurt her that much, but he pulled the trigger according to his statement in this file. If I am misinterpreting that, perhaps they will reverse me for having said that. . . . I don't think this is one of those crimes that the subject of probation based on these facts.

## II. Analysis

On appeal, the sole issue is whether the trial court erred in denying the appellant any sentencing alternative to confinement in the Tennessee Department of Correction for the duration of his four-year sentence. This court reviews the trial court's selection of the manner of service of a sentence de novo. Tenn. Code. Ann. § 40-35-401(d) (1997). In conducting our de novo review, we consider the following factors: (1) the evidence, if any, received at the trial or guilty plea hearing and the sentencing hearing; (2) the pre-sentence investigation report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. § § 40-35-102, -103 (1997), -210 (1999); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991).

> In order to facilitate our review of the trial court's sentencing determination, the [Tennessee Criminal] Sentencing Reform Act of 1989 requires the trial judge to place in the record, either orally or in writing, [applicable] enhancement and mitigating factors, or the absence of such factors, along with specific findings of fact upon which the principles of sentencing are based.

State v. Dies, 829 S.W.2d 706, 710 (Tenn. Crim. App. 1991); see also Tenn. Code Ann. § 40-35-209(c) (1997); Tenn. Code Ann. § 40-35-210(f). If the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's sentencing determination a presumption of correctness. Tenn. Code Ann. § 40-35-401(d); Ashby, 823 S.W.2d at 169. In any event, the burden is upon the appellant to demonstrate

the impropriety of his sentence. State v. Grigsby, 957 S.W.2d 541, 544 (Tenn. Crim. App. 1997); State v. Loden, 920 S.W.2d 261, 266 (Tenn. Crim. App. 1995).

Keeping in mind the standard of review, we turn to the principles set forth in Tenn. Code Ann. § 40-35-102 governing a trial court's selection of the manner in which a defendant will serve his sentence. Subsection (5) of Tenn. Code Ann. § 40-35-102 provides:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration . . . .

In contrast, subsection (6) of Tenn. Code Ann. § 40-35-102 provides that a defendant who does not fall within the class of convicted felons described above "and who is an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options." Id. at (6).

The record before this court does not reflect the appellant's possession of a criminal history evincing a clear disregard for the laws and morals of society, nor does the record reflect a failure of past efforts at rehabilitation. Thus, as a Range I standard offender of a class C felony, the appellant enjoyed the presumption that he was a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40-35-102(5) & (6); see also Tenn. Code Ann. § 40-35-104 (1997). Moreover, we note that the appellant was statutorily eligible for the alternative sentencing option of probation. Tenn. Code Ann. § 40-35-303(a) (1997).[2] Because the trial court in this case failed to indicate whether or not it afforded the appellant the presumption in favor of alternative sentencing, including probation, we will not defer to its sentencing determination.

Proceeding in our de novo review without a presumption of correctness, we note that, although the appellant is entitled to the presumption in favor of alternative sentencing, the State may rebut the presumption with "evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). Moreover, "[w]hile the statute speaks in terms of *overcoming the presumption*, sufficient contrary evidence, typically, also *defeats* the defendant's claim to alternative sentencing." State v. David Keith Lane, No. 03C01-9607-CC-00259, 1997 WL 332061, at *10 (Tenn. Crim. App. at Knoxville, June 18, 1997), affirmed by State v. Lane, 3 S.W.3d 456 (Tenn. 1999). Contrary evidence will be "sufficient" if it demonstrates that

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

---

[2]Because he committed a violent felony offense, the appellant does not satisfy the minimum criteria for eligibility under the Tennessee Community Corrections Act of 1985. Tenn. Code Ann. § 40-36-106(a)(3) (2000 Supp.). Moreover, the record does not reflect and the appellant does not claim eligibility for community corrections due to any "special needs." Tenn. Code Ann. § 40-36-106(c); see also Grigsby, 957 S.W.2d at 546-547; State v. Boston, 938 S.W.2d 435, 439 (Tenn. Crim. App. 1996).

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). In assessing whether the State has adduced sufficient contrary evidence, a trial court may also consider those statutory enhancement and mitigating factors relevant to the considerations listed in Tenn. Code Ann. § 40-35-103(1). State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Also, "[a] felon's rehabilitation potential and the risk of repeating criminal conduct are fundamental in determining whether he or she is suited for alternative sentencing." State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999)(citing Tenn. Code Ann. § 40-35-103(5)).

The appellant argues that the trial court erred in this case by denying him an alternative sentence on the basis of the need to avoid depreciating the seriousness of his offense. Tenn. Code Ann. § 40-35-103(1)(B). In support of his argument, the appellant cites the trial court's apparent reliance upon the occurrence of a death in this case. We also note the trial court's consideration of the appellant's statement to the police in which he admitted intentionally discharging the pistol toward his wife's chest knowing that she would thereby suffer injury, albeit he unconvincingly denied any realization that she might suffer serious injury or death.

In order to deny alternative sentencing due to the need to avoid depreciating the seriousness of the offense, "the circumstances of the offense 'as committed, must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring probation.'" State v. Fields, 40 S.W.3d 435, 441 (Tenn. 2001); State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997); State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000). In determining whether the circumstances of an offense satisfy this standard, a trial court may not consider factors which constitute elements of the offense in question. State v. Housewright, 982 S.W.2d 354, 358 (Tenn. Crim. App. 1997); Bingham, 910 S.W.2d at 454-455. In other words, "'[o]nce the legislature has specifically authorized the use of sentencing alternatives to confinement for a particular offense, trial courts may not summarily impose a different standard by which probation is denied solely because of the defendant's guilt for that offense.'" Bingham, 910 S.W.2d at 454 (alteration in original). The death of the victim is an element of voluntary manslaughter. Tenn. Code Ann. § 39-13-211 (a) (1997). Accordingly, we agree with the appellant that the trial court could not rely upon the occurrence of a death in denying an alternative sentence for that offense. Similarly, the trial court could not rely upon the appellant's intentional discharge of the pistol toward his wife's chest and his knowledge of the potential consequences because voluntary manslaughter entails an intentional or knowing killing of another. Id.

That having been said, in denying an alternative sentence in order to avoid depreciating the seriousness of an offense, a trial court may "look behind" a defendant's plea

agreement and ascertain the true nature of the offense committed by a defendant. See, e.g., State v. Robby J. Cox, No. E1999-00159-CCA-R3-CD, 2001 WL 12222, at *3 (Tenn. Crim. App. at Knoxville, January 5, 2001); cf. also State v. Tamela Grace McGhee, No. 03C01-9807-CR-00228, 2000 WL 21043, at *11 (Tenn. Crim. App. at Knoxville, January 14, 2000). We acknowledge that, both at the guilty plea hearing and at the sentencing hearing, the victim's family expressed their fervent opposition to the plea agreement in this case. Nevertheless, the trial court found that the evidence adduced at the sentencing hearing in fact reflected the appellant's commission of voluntary manslaughter. The record before this court does not preponderate otherwise. State v. Parker, 932 S.W.2d 945, 956 (Tenn. Crim. App. 1996); State v. Jackie R. Ellis, No. 01C01-9804-CC-00177, 1999 WL 219599, at *3 (Tenn. Crim. App. at Nashville, April 16, 1999).

Moreover, the appellant asserts in his brief that review of applicable statutory enhancement and mitigating factors militates against a denial of an alternative sentence due to the need to avoid depreciating the seriousness of the offense. In particular, the appellant notes that his culpability was only minimally enhanced by the factor set forth in Tenn. Code Ann. § 40-35-114(9) (1997) and was substantially mitigated by the factors set forth in Tenn. Code Ann. §40-35-113(2), (3), (10), (11), & (13) (1997).

With respect to the enhancement factor cited by the appellant, we agree that his employment of a firearm under the circumstances of this case does not weigh heavily in the balance. Certainly, "[t]he mere fact that . . . a firearm was employed in the commission of the offense [is] not sufficient, without more, to justify a sentence of total confinement." State v. Louis Lavergne, No. 01C01-9803-CR-00128, 1999 WL 460082, at *4 (Tenn. Crim. App. at Nashville, July 8, 1999). Moreover, we agree that the record does not support the application of additional statutory enhancement factors.[3] However, the mitigating effect of Tenn. Code Ann. § 40-35-113 (2), (3), and (11) was largely embodied in the appellant's plea to the offense of voluntary manslaughter in lieu of the charged offense of second degree murder. In so observing, we are not unmindful of our prior holding in the distinct context of determining the length of a defendant's sentence that there is no prohibition against "double mitigation." State v. Stacy Allen Bullard, No. E1999-00796-CCA-R3-CD, 2000 WL 277314, at *9 (Tenn. Crim. App. at Knoxville, March 15, 2000), perm. to appeal denied, (Tenn. 2000). Nevertheless, "'double credit' need not be automatically applied in voluntary manslaughter cases." Lavergne, No. 01C01-9803-CR-00128, 1999 WL 460082, at *3 n.4.

---

[3]As previously noted, the record in this case does reflect that the Presleys' twin daughters were present in the apartment at the time of this offense. Specifically, the twins were in their bedroom. Tenn. Code Ann. § 40-35-114(10) will enhance a defendant's sentence when the record demonstrates that he "had no hesitation about committing a crime when the risk to human life was high." Moreover, we have held that, "[a]lthough factor (10) is inherent in every homicide case relative to the victim, the trial court may consider this factor when the defendant endangers the lives of people other than the victim." State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000), perm. to appeal denied, (Tenn. 2000); see also, e.g., State v. Thomas Edward Bradley, No. 02C01-9803-CC-00084, 1999 WL 165682, at *2 (Tenn. Crim. App. at Jackson, March 26, 1999). However, the record does not reflect the proximity of the twin's bedroom to the master bedroom in which the shooting occurred or otherwise indicate that the children were endangered by the appellant's conduct.

-8-

Moreover, any "double credit" to which the appellant might be entitled[4] and any mitigation flowing from the appellant's assistance to the police, his lack of any prior criminal record, his military service, and the "strong" support of his family is overshadowed by his dishonesty at the sentencing hearing and his failure at the sentencing hearing to fully acknowledge the very culpability to which he pled on November 5, 1999.

Implicit in the trial court's emphasis upon the appellant's statement to the police was its finding that the appellant was untruthful at the sentencing hearing when he denied intentionally firing the pistol toward his wife's chest, claiming that the shooting was "accidental." The evidence contained in the record does not preponderate against the trial court's finding, Parker, 932 S.W.2d at 956; Ellis, No. 01C01-9804-CC-00177, 1999 WL 219599, at *3, and our supreme court in State v. Gutierrez, 5 S.W.3d 641, 647 (Tenn. 1999), held that a defendant's failure to acknowledge culpability for his actions may support a finding that a sentence of confinement is necessary to avoid depreciating the seriousness of an offense. See also State v. Amy Boyd, No. E1999-02218-CCA-R3-CD, 2000 WL 1376674, at *5 (Tenn. Crim. App. at Knoxville, September 26, 2000), perm. to appeal denied, (Tenn. 2001).

Moreover, this court has generally observed that a defendant's potential or lack of potential for rehabilitation "may weigh in on the side of evidence that rebuts the presumption in favor of alternative sentencing." State v. William D. Britt, No. E2000-01107-CCA-R3-CD, 2001 WL 177051, at *5 (Tenn. Crim. App. at Knoxville, February 23, 2001); see also State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996); State v. Henry Christopher Johnson, No. E1999-02501-CCA-R3-CD, 2000 WL 893271, at **2-3 (Tenn. Crim. App. at Knoxville, July 6, 2000), perm. to appeal denied, (Tenn. 2001). A defendant's potential or lack of potential for rehabilitation is measured in part by the degree of both his candor before the court and his willingness to accept responsibility for his offense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); Zeolia, 928 S.W.2d at 463.

Finally, we note the State's contention that "confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses." Tenn. Code Ann. § 40-35-103(1)(B). Recently, in Hooper, 29 S.W.3d at 10-12, our supreme court clarified the requisite analysis when a court seeks to rely upon the need for deterrence in denying an alternative sentence. Specifically, the court held that the need for deterrence will suffice

> so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

---

[4]Interestingly, we note regarding the application of Tenn. Code Ann. § 40-35-113(2) that the appellant's new theory at the sentencing hearing that the fatal shot was accidental "does not embrace provocation as an operative factor." State v. Samuel D. Braden, No. 01C01-9610-CC-00457, 1998 WL 85285, at *6 (Tenn. Crim. App. at Nashville, February 18, 1998).

Id. at 10. The following factors are relevant when determining whether the need for deterrence is present and whether incarceration is particularly suited to achieve the goal of deterrence:

> 1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole.
>
> . . . .
>
> 2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior.
>
> . . . .
>
> 3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case.
>
> . . . .
>
> 4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective.
>
> . . . .
>
> 5) Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Id. at 10-12.

In this case, the State did not present testimony concerning the incidence of voluntary manslaughter in the community, jurisdiction, or the state as a whole. Moreover, the appellant correctly notes the trial court's observation that Anderson County experiences a lower incidence of homicides than smaller surrounding counties. The trial court explained that "our society here is a little more sophisticated and homicide doesn't seem to be the way that they avenge any activity as they do in some of these other surrounding counties." However, notwithstanding the sophistication of Anderson County residents, the State did present Becky Rod's testimony concerning the rising number of orders of protection issued in Anderson County. The appellant responds that "there was no connection made between orders of protection, domestic violence, or the specific facts underlying the defendant's commission of voluntary manslaughter." Cf. State v. Sharon Marie Shell, No. 03C01-9803-CR-00119, 1999 WL 222696, at *7 (Tenn. Crim. App. at Knoxville, April 14, 1999).

A preponderance of the evidence in this case established that the appellant's offense arose from his participation in a violent and physical altercation with his wife. Moreover, the offense to which the appellant pled guilty entailed his commission of an assault upon his wife, see State v. Burns, 6 S.W.3d 453, 466 (Tenn. 1999), and the absence of any justification. An order of protection is intended to prevent domestic abuse, Cable v. Clemmons, 36 S.W.3d 39, 42 (Tenn. 2001), and issues upon a showing thereof by a preponderance of the evidence, Tenn. Code Ann. § 36-3-605(b) (1996). However, for purposes of the statute authorizing the issuance of orders of protection, "'[a]buse' means inflicting or attempting to inflict physical injury on an adult by other than accidental means, physical restraint, or malicious damage to the personal property of the abused

party." Tenn. Code Ann. § 36-3-601(1) (1996).[5]  Because domestic abuse encompasses conduct other than assaultive behavior between spouses, we must agree with the appellant that the incidence of orders of protection in Anderson County does not necessarily demonstrate a need in that county to deter criminal behavior similar to the appellant's.  Moreover, it is not entirely clear from the record whether Rod's testimony was limited to final orders of protection or included ex parte orders. See Tenn. Code Ann. § 36-3-605(a).

A review of the remaining Hooper factors in the context of this case similarly fails to reveal evidence that a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole. Hooper, 29 S.W.3d at 10.  Nevertheless, we decline to disturb the trial court's sentencing determination in light of the need to avoid depreciating the seriousness of this offense and the appellant's poor potential for rehabilitation as shown by his lack of candor before the court and his failure to accept responsibility for his actions.

### III.  Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[5]Under Tenn. R. Evid. 202(a), a trial court would be required to judicially notice the law relating to orders of protection.